UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ELLEN GOBER,
    Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:10-cv-532
Spiegel, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement of

Errors (Doc. 6), the Commissioner's Memorandum in Opposition (Doc. 10), and plaintiff's

Reply Memorandum. (Doc. 11).

### PROCEDURAL BACKGROUND

Plaintiff was born in 1963 and was 40 years old at the time her insured status expired in

March 2004. Plaintiff has a college degree and past relevant work experience as a file clerk, data

entry clerk, shipping clerk/packer, substitute teacher and cashier/deli clerk. (Tr. 24, 105-110).

Plaintiff filed an application for DIB on September 17, 2004, alleging disability since

January 15, 1999, due to a brain abscess, depressive disorder, anxiety disorder, cognitive disorder

and hemianopsia. (Tr. 45-48, 57-58). Her application was denied initially and upon

reconsideration. Plaintiff requested and was granted a *de novo* hearing before an administrative

law judge (ALJ). On August 2, 2007, plaintiff, who was represented by counsel, appeared and

testified at a hearing before ALJ Samuel A. Rodner. (Tr. 224-76). A vocational expert (VE), John F. Williams, also appeared and testified at the hearing. (Tr. 263-75).

On October 25, 2007, the ALJ issued a decision denying plaintiff's DIB application. (Tr. 17-26). The ALJ determined that plaintiff last met the insured status requirements for DIB on March 31, 2004. (Tr. 19). The ALJ next found that plaintiff suffers from the following severe impairments: brain abscess, depressive disorder, not otherwise specified (NOS), anxiety disorder, NOS, and cognitive disorder, NOS, but that such impairments or combination of impairments did not meet or equal the level of severity described in the Listing of Impairments. (Tr. 19, 20). The ALJ determined that plaintiff's allegations concerning the intensity, duration and limiting effects of her impairments are not entirely credible. (Tr. 24). Through the date last insured, the ALJ determined that plaintiff had the residual functional capacity (RFC) to perform light exertional work. (Tr. 20). Specifically, plaintiff was limited to jobs with simple one and two step directions and routine repetitive tasks despite her average IQ's and working memory of 108, she should not work at jobs which require more than minimal interactions with co-workers, supervisors and the public, and because of her lowered stress tolerance, she should also avoid a constant and rapid pace. (Tr. 20). The ALJ determined that plaintiff was unable to perform any past relevant work. (Tr. 24). The ALJ concluded that through the date last insured and given the above RFC, plaintiff can perform a significant number of unskilled light exertional level jobs in the local and national economy, including jobs as a motel cleaner, night cleaner, and hospital cleaner. (Tr. 25). Consequently, the ALJ found that plaintiff is not disabled under the Act, at any time from January 15, 1999, the alleged onset date, through March 31, 2004, the date last insured and therefore not entitled to DIB. The Appeals Council denied plaintiff's request for

2

review (Tr. 9-11), making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether

3

the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability

is made and the inquiry ends. Second, if the individual is not currently engaged in substantial

gainful activity, the Commissioner must determine whether the individual has a severe

impairment or combination of impairments; if not, then a finding of nondisability is made and the

inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare

it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the

impairment meets or equals any within the Listing, disability is presumed and benefits are

awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal

those in the Listing, the Commissioner must determine whether the impairments prevent the

performance of the individual's regular previous employment. If the individual is unable to

perform the relevant past work, then a prima facie case of disability is established and the burden

of going forward with the evidence shifts to the Commissioner to show that there is work in the

national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d

1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461

U.S. 957 (1983).

Plaintiff has the burden of establishing disability by a preponderance of the evidence.

*Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v.

Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by

showing an inability to perform the relevant previous employment, the burden shifts to the

Commissioner to show that plaintiff can perform other substantial gainful employment and that

such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir.

1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima

4

facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.,* 708 F.2d 1048, 1054 (6th Cir. 1983). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Blakely v. Commissioner*, 581 F.3d 399, 406

5

(6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004)*; Walters*, 127 F.3d at 530. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). In weighing the various opinions and medical evidence, the ALJ must consider other pertinent factors such as the length, nature and extent of the treatment relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's supportability by evidence and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6); *Wilson*, 378 F.3d at 544. In terms of a physician's area of specialization, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision

"with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan* 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. 1990) (unpublished), 1990 WL 94. Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

### MEDICAL RECORD

At age 13, plaintiff developed a brain abscess that required emergency surgery in August 1976. (Tr. 123-24). Plaintiff tolerated the surgery well, and follow-up notes indicated that

7

"recovery has been good - but residual deficits persist." (Tr. 127). Partial lobe disjunction occurred, resulting in cortical type blindness, spatial disorganization, and poor color recognition. *Id.* Temporal lobe disjunction also occurred resulting in right hemiparesis and right homonymous hemianopsia.[1] *Id.* Plaintiff was advised to seek language therapy, mobility training and occupational and physical therapy. (Tr. 128). Plaintiff remained stable and the record does not contain any additional medical records until 1999.

On September 10, 1999, plaintiff was seen by Dr. Robert Tureen for a psychological evaluation. At that time, plaintiff complained of decreased memory, feelings of frustration, and being easily distracted. (Tr. 189). Dr. Tureen administered the Wechsler Adult Intelligence Scale-III and found that the claimant had a verbal IQ of 99, performance IQ of 94, and full scale IQ of 97, which placed her in the average range of intelligence. Plaintiff's working memory score was 108, also in the average range. (Tr. 190). Dr. Tureen found that she had very significantly impaired memory functions in terms of new learning, but also found that plaintiff's test pattern indicated she was of average intellectual efficiency and had good novel problem solving ability. (Tr. 191-92). Dr. Tureen stated that plaintiff's awareness of environmental feedback and interaction, along with the presence of a memory deficit, often forced individuals to become withdrawn and isolated. (Tr. 192). Dr. Tureen noted that plaintiff had made a good effort in compensating for her deficits, and, along with her deficits, plaintiff had developed "some considerable strengths." (Tr. 192). Dr. Tureen did not find that plaintiff had impulse or

---

[1] Hemianopsia is a synonym of hemianopia which means loss of vision for one half of the visual field of one or both eyes. *Werderitsh v. Secretary of Dept. of Health and Human Services*, Case No. 99-310V, 2006 WL 1672884, at * 2, n.2 (Fed. Cl. May 26, 2006) (citing *Stedman's Medical Dictionary*, 27th ed. (2000) at 798).

dyscontrol type syndrome, but instead believed that her difficulties resulted from feelings of frustration, impotence, and low self-esteem, which she had been feeling for years since her brain surgery. (Tr. 192). Dr. Tureen recommended that plaintiff develop some vocational skills that could either be used in remunerative employment or volunteer work. (Tr. 193).

On March 14, 2000, plaintiff began treatment with Colin Zadikoff, M.D., a neurologist. Dr. Zadikoff diagnosed labryinthisis (vertigo) and paresthesias. (Tr. 131, 132). In June 2000, plaintiff complained of a six month history dizziness and blindness. (Tr. 134). An MRI of plaintiff's brain performed on June 8, 2000, revealed a large area of cystic encephalomalicia with some adjacent gliosis involving the left occipital lobe, parietal lobe, and a portion of the posterior temporal lobe. (Tr. 134). There were no brainstem signal abnormalities detected. *Id.* Plaintiff was seen by Dr. Zadikoff on August 23, 2000, complaining of vertigo. (Tr. 137). Progress notes from Dr. Zadikoff indicate that he prescribed plaintiff medication for vertigo from August 2000 through November 2000. (Tr. 136-39).

Dr. Murthy, a psychiatrist, saw plaintiff from July 30, 2002 through May 7, 2003. (Tr. 147-150). Dr. Murthy's treatment notes show that he treated plaintiff for complaints of stress-related depression and anxiety. (Tr. 147-50).

In May 2003, plaintiff presented to Dr. Zadikoff complaining of memory loss, considerable stress, and difficulties coping with her three children. (Tr. 140). Plaintiff denied having headaches or other neurologic symptoms. (Tr. 140). Dr. Zadikoff also noted that plaintiff "has a history of brain abscess in childhood. She has a right hemianopia which resulted from that." *Id.* Dr. Zadikoff further noted that an MRI in 2000 showed no new pathology." (Tr. 140). Upon examination, Dr. Zadikoff indicated that plaintiff's motor, sensory, and cerebellar exams

9

were "normal." (Tr. 140). He further found that plaintiff "has her usual right hemianopia, but her cranial nerves were otherwise in tact." *Id*. Dr. Zadikoff also determined that plaintiff's memory difficulties were stress-related, but metabolic causes are to be excluded. (Tr. 140).

On November 18, 2004, Dr. John Streff, an optometrist, examined plaintiff and diagnosed her with bilateral hemianopsia (the loss of half of the field of view on the same side in both eyes), secondary to plaintiff's past brain abscess, and myopia. (Tr. 156). Dr. John Streff gave plaintiff a prescription for glasses and instructed her to follow-up in four months. (Tr. 156). In a March 2005 follow-up examination, Dr. Dean Streff, another optometrist, found plaintiff had 20/20 vision in each eye with glasses. (Tr. 152). Plaintiff's right field of vision also had expanded 5 degrees with her glasses. (Tr. 152). Dr. Dean Streff ordered plaintiff to continue with her present prescription, gave her exercises to do at home to expand her right field of vision, and told her to follow-up in two to four months. (Tr. 152).

Plaintiff was evaluated over a period of three days on December 29, 2004, January 5, 2005, and January 28, 2005 by Jennifer Loyden, a psychological assistant, and Dr. Bouman, a psychologist. (Tr. 167-73). Plaintiff was very talkative during her evaluation and complained of depression, difficulty relaxing, frustration, and past suicidal ideation. (Tr. 169). Plaintiff also reported back, shoulder, and hip pain. (Tr. 169). Plaintiff had average intellectual functioning and was performing "in the average range in most cognitive areas assessed," although she had difficulty in some areas of cognitive functioning that "could be problematic in daily functioning." (Tr. 172). Furthermore, although plaintiff demonstrated memory difficulties, she appeared to do better with verbal repetition, which allowed her to "encode information and recognize it after a delay." (Tr. 172). Plaintiff was diagnosed with major depressive disorder, adjustment reaction

10

with anxious mood, and cognitive disorder. (Tr. 171-72). Dr. Bouman and Ms. Loyden opined that plaintiff should not return to work because of her significant emotional issues and cognitive difficulties. (Tr. 173).

In February 2005, Robert Gaffey, Ph.D, a state agency psychologist, reviewed plaintiff's medical record up until March 31, 2004, her date last insured, and found that there was insufficient psychological evidence to determine if plaintiff was suffering from a severe mental impairment prior to March 31, 2004. (Tr. 187). On May 20, 2005, Alice Chambly, Psy.D., another state agency psychologist, reviewed the medical record and affirmed Dr. Gaffey's findings. (Tr. 175).

On May 21, 2007, William Cody, a Diplomat with the American Board of Vocational Experts, provided a vocational assessment at the request of plaintiff's attorney. (Tr. 208-16). Mr. Cody reviewed the medical evidence and concluded that plaintiff was "permanently and totally occupationally disabled" because of her cognitive limitations. (Tr. 212). Mr. Cody found that Dr. Tureen's psychological evaluation and Dr. Bouman's neuropsychological evaluation supported his opinion. (Tr. 212).

## HEARING TESTIMONY

At the August 2, 2007 administrative hearing, plaintiff testified that the residual affects from the operation to drain her brain abscess caused her to go from being an "A" student to a "C" student. (Tr. 230-31). Plaintiff was considered learning disabled in high school and received tutoring. (Tr. 231). Plaintiff went to college at Miami University, where she received financial assistance and special services from the Bureau for the Services of the Visually Impaired. (Tr.

231). Plaintiff graduated from Miami University with a degree in elementary education. (Tr. 232).

With respect to her work history, plaintiff testified that she switched from full-time work to part-time work when she became pregnant with her third child. (Tr. 234). Plaintiff wanted a part-time position so she could stay home with her child, and she alleged that she was also having back problems. (Tr. 234). After going on maternity leave for her third child, plaintiff testified that she did not return to her job in January 1999 and had not worked since that date. (Tr. 236-38). She began having difficulty taking care of her children in 2002 or 2003 due to her mental impairments. Her children were removed from her home and stayed with her sister for a few days. (Tr. 244-45). In March 2004, plaintiff was taking Zoloft and seeing a psychiatrist, Dr. Murthy. (Tr. 245-46).

Plaintiff testified that her brain abscess also paralyzed her right side, causing her to have no peripheral vision in the right side of both of her eyes. (Tr. 246-47). Plaintiff also had numbness and tingling on her right side, which prohibited her from standing for long periods of time. (Tr. 247). Plaintiff had intermittent back pain related to her brain injury, which was sometimes 10 out of 10 on the pain scale. (Tr. 249). She did not take any prescribed pain medication, but over-the-counter pain medication reduced her back pain to 5 out of 10 on the pain scale. (Tr. 250). Plaintiff was also diagnosed with vertigo and experienced dizziness for up to a minute occasionally. (Tr. 251). Plaintiff had difficulty lifting and walking, and could sit for "an hour or so" without interruption. (Tr. 248-50). Plaintiff stated that she was able to do house work, change diapers, feed her children, and bathe her children. (Tr. 251-52).

Plaintiff's sister, Jane Temming, also testified at the administrative hearing. Ms. Temming saw plaintiff every week or every couple of weeks. (Tr. 254-55). Ms. Temming stated

that plaintiff had become depressed, overwhelmed, and experienced severe headaches as she had more children. (Tr. 256). Ms. Temming said that plaintiff's vision problems made it difficult for her to pick out produce or canned goods while grocery shopping. (Tr. 257). Plaintiff became frustrated quickly when dealing with her children and her husband. (Tr. 258). Ms. Temming stated that plaintiff required daily help with her children, making dinner, and getting to appointments. (Tr. 261).

## VOCATIONAL EXPERT TESTIMONY

At the administrative hearing, the VE testified that a hypothetical person with the same vocational background as plaintiff and the same RFC as found by the ALJ would be unable to perform plaintiff's past relevant work. (Tr. 266-70). The vocational expert testified that plaintiff would be able to perform a significant number of jobs in the regional economy, including motel cleaner, night cleaner, and hospital cleaner. (Tr. 270-71).

The ALJ also asked the VE to consider a second hypothetical question "assuming the same age, education, and work background" as plaintiff as well "as a loss of peripheral vision to the right, but otherwise, can see" and whether such a person would have "[a]ny problems there as far as doing those cleaner jobs"? (Tr. 271-272). The VE responded as follows:

> VE: The visual part gets me because I'm afraid that she has to see from side to side to make sure she's not going to fall. But, no, I think she could do them, really.
>
> ALJ. Could do those jobs?
>
> VE. Yes.

(Tr. 272)

13

When asked if plaintiff could do any jobs if the ALJ found her testimony and/or her sister's testimony to be credible, the VE stated "[no], sir. I do not feel so." *Id.*

> ATTY.  What is it about the sister's testimony or her testimony that would preclude her from doing work?

> VE.  There's a couple of problems. Her perception of other people and stressful situations, as they've said, with her children, and giving orders, and taking orders, because the husband and her have conflicting ways of doing things. And one wants to do it this way, and one wants to do it that way, that shows that she would have a hard time dealing with a boss and dealing with somebody that told her incorrectly what to do, and how to do it, and when to do it.  Also, her visual perception on both sides scare me, for the simple fact she has no idea of what's coming to her from either side.  And so- -

> ALJ:  Well, no, she said right side.

> VE: Well, the right side. I would think that that would cause a problem in a work setting.

> ALJ: The testimony was half vision in each eye, meaning- -

> VE: That's what I thought.

> ALJ: - - the left eye, you lose the right vision, and the right eye, you lose everything peripheral to the right.

> VE:  Okay. So, yeah, it would cause a problem in the work setting, because a lot of jobs are visual.  You have to see what you're doing.

> ALJ: But if she could see straight ahead, that would be a problem with the cleaner?

> VE: Yeah, because the - - it's just - - it's a difficult thing to do. If she's compensated for it from doing housework, than possibly, no, you know.  We didn't get into that. And, you know, she's had a lot of assistance. And I don't know what's going on there. You know you're asking me to guess, and I'm- -

> ALJ: Well, no. I'm asking you as a vocational exert - -

> VE: As a vocational expert- -

ALJ: First of all, there's no evidence of it.

VE: Right.

ALJ: But if hypothetically she is limited with her peripheral vision only on the right, why would that interfere with cleaning?

VE: So this- - right here in the middle- -

ALJ: But you're assuming things not in the hypothetical, Mr. Williams.

VE: He just said was one eye couldn't- - both eyes- -

ALJ: Well, that's his hypothetical. There's nothing in the file- - you're saying if that hypothetical is true- -

ATTY: That was her testimony that her loss of vision is the right half of each eye. So the right eye, you would lose everything from the center point to the right.

VE: Right.

ATTY: The left eye, you would lose everything from the center point likewise to the right.

VE: Right.

ATTY: If that was true, what then?

VE: I would have- - I think she would have problems cleaning.

ALJ: Even if she could do her own housework?

VE: Yes. Because in a competitive workforce, she needs to do it in such and such a time. And in a certain period of time, she doesn't- - she's probably not going to be able to take her breaks that she needs to take, okay, because they require them to do so many rooms. For them to do this task in a certain amount of time, it's a competitive basis.

(Tr. 272-274).

15

## OPINION

The pertinent period of time at issue concerns plaintiff's work abilities and limitations between January 15, 1999 until March 31, 2004.  To establish her claim for disability benefits, plaintiff was required to establish that she was disabled on or before March 31, 2004, the date her insured status expired for purposes of Disability Insurance Benefits.  *See Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir. 1984).  While plaintiff was not required to prove she was disabled for a full twelve months *prior* to the expiration of her insured status, she was required to prove "the onset of disability" prior to the expiration of her insured status and that such disability lasted for a continuous period of twelve months.  *See Gibson v. Secretary,* 678 F.2d 653, 654 (6th Cir. 1982); 42 U.S.C. § 423(d)(1)(A).

Post insured status evidence of new developments in plaintiff's condition is generally not relevant.  *Bagby v. Harris*, 650 F.2d 836 (6th Cir. 1981).  *See also Higgs v. Bowen,* 888 F.2d 860, 863 (6th Cir. 1988) (evidence post-dating expiration of claimant's insured status is only minimally probative).  However, such evidence may be examined when it establishes that the impairment existed continuously and in the same degree from the date that plaintiff's insured status terminated.  *Johnson v. Secretary of H.E.W.*, 679 F.2d 605 (6th Cir. 1982).  *See also King v. Sec. of Health and Human Servs.,* 896 F.2d 204, 205-06 (6th Cir. 1990) (post-expiration evidence may be considered, but must relate back to plaintiff's condition prior to expiration of date last insured).

Plaintiff assigns four errors in this case.  First, plaintiff contends the ALJ's finding that plaintiff can perform sustained work activities is not supported by substantial evidence.  Second, plaintiff argues that the ALJ failed to comply with 20 C.F.R. § 404.1527 in weighing the opinions

16

of plaintiff's treating physicians and failed to provide good reasons for the rejection of such opinions. Third, plaintiff asserts that the ALJ failed to consider the various factors set forth in 20 C.F.R. § 404.1527(d) in considering the weight afforded to plaintiff's treating physicians. Finally, plaintiff asserts that the ALJ failed to properly evaluate plaintiff's credibility pursuant to SSR 96-7p.

Plaintiff's assignments of error each focus on the ALJ's consideration of the evidence relating to plaintiff's visual impairments. After careful consideration of the arguments of counsel and the evidence of record, the undersigned finds that the ALJ's decision is not supported by substantial evidence.

### I. The ALJ improperly evaluated plaintiff's visual impairment

Plaintiff contends that the ALJ's RFC assessment is not supported by substantial evidence because the ALJ improperly evaluated plaintiff's visual impairments.[2] The undersigned agrees. At step two of the sequential process, the ALJ found plaintiff's brain abscess, depressive disorder, not otherwise specified (NOS), anxiety disorder, NOS, and cognitive disorder, NOS to be severe impairments. (Tr. 19). However, the ALJ concluded that plaintiff's visual impairment was not considered to be a "severe impairment." *Id.* The ALJ noted that plaintiff complained of having no peripheral vision in her right eye, but found that "there is no substantial evidence that the claimant lacks peripheral vision despite allegations to the contrary either before or after March 31, 2004." (Tr. 19). This finding is inconsistent with the evidence of record.

---

[2] A claimant's "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," which is defined as "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p.

Discharge notes from plaintiff's brain surgery in 1976 show that she suffered from the following "residual deficits:" cortical type blindness, spatial disorganization, poor color recognition, and right homonymous hemianopsia. (Tr. 127). Thereafter, on June 8, 2000, Dr. Zadikoff treated plaintiff for dizziness and also noted "blindness." (Tr. 134). In March 2003, Dr. Zadikoff opined that plaintiff "has a right hemianopia" which resulted from her brain abscess in 1976. (Tr. 140). After examining plaintiff, Dr. Zadikoff found that plaintiff "has her usual right hemianopia." *Id.* Additionally, in November 2004, Dr. Streff, an optometrist, examined plaintiff and diagnosed her with bilateral hemianopsia (the loss of half of the field of view on the same side in both eyes), secondary to plaintiff's past brain abscess, and myopia. (Tr. 156). Thus, substantial evidence exists in the record that plaintiff suffers from bilateral hemianopia which results in diminished peripheral vision. The ALJ's finding to the contrary is factually erroneous.[3]

Furthermore, the ALJ failed to address the above-referenced findings from Dr. Zadikoff or Dr. Streff, and failed to provide sufficient analysis relating to plaintiff's visual impairment. The ALJ's analysis regarding plaintiff's visual impairments consists solely of his conclusory statements that plaintiff's visual impairments are not supported by the evidence of record (Tr. 19), and are "inconsistent with the objective evidence." (Tr. 24). Such statements are not support by the evidence of record and prevent the Court from engaging in meaningful review of the ALJ's decision. When an ALJ fails to mention relevant evidence in his or her decision, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Morris v.*

---

[3] It appears that the ALJ did not fully understand the nature of plaintiff's visual impairment. In questioning the vocational expert, the ALJ stated that he "didn't see any visual problem" in the record and "there is no visual acuity exam." (Tr. 266). Plaintiff is not asserting any issues related to visual acuity (*i.e.,* 20/20 vision); plaintiff's problem arises out of her diminished scope of vision and the loss of half of the field of view on the same side in both eyes. (Tr. 156).

*Secretary of Health & Human Servs.*, Case No. 86-5875, 1988 WL 34109, at * 2 (6th Cir. Apr. 18, 1988) (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)); *see also Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (The Court cannot uphold the decision of an ALJ, even when there may be sufficient evidence to support the decision, if "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.").

Additionally, in support of the ALJ's decision, the Commissioner contends that the record did not contain any work-related limitations associated with plaintiff's visual impairments and, therefore, the ALJ properly concluded that plaintiff's visual impairment was not severe. This contention lacks merit as the testimony of the VE establishes the presence of work-related limitations relating to plaintiff's visual impairments. Although the treatment notes relating to plaintiff's visual impairment do not identify any specific work-related limitations, the VE testified that an individual with no peripheral vision "would have problems" doing the cleaner jobs. (Tr. 274).

In sum, the ALJ is required to properly consider all of plaintiff's impairments in determining plaintiff's RFC and provide a narrative discussion describing how the evidence supports each conclusion. 20 C.F.R. §§1520(c) and 404.1545; SSR 96-8p. The ALJ failed to do so in this case. Because the ALJ failed to properly consider and evaluate plaintiff's visual impairments, his RFC assessment is not supported by substantial evidence. As such, this matter should be remanded for further proceedings.

19

II.   **The ALJ failed to properly evaluate the medical evidence of record in accordance with Sixth Circuit precedent and Social Security regulations**

A.   *Plaintiff's treating optometrists*

On November 18, 2004, plaintiff began treating at the Streff Optometry Center and was initially seen by Dr. John Streff. (Tr. 156). Plaintiff reported that she had no peripheral vision to her right side resulting from her brain surgery at age 13. Dr. Streff's treatment notes indicate that plaintiff "continues to have balance problems, is a slow reader and fell on her way to the examination today." *Id.* Upon examination, Dr. Streff diagnosed plaintiff with bilateral hemianopsia (the loss of half of the field of view on the same side in both eyes), secondary to plaintiff's past brain abscess, and myopia. (Tr. 156). Dr. Streff gave plaintiff a prescription for glasses and instructed her to follow-up in four months. (Tr. 156). Plaintiff was next seen in March 2005 for a follow-up examination with Dr. Dean Streff, another optometrist. (Tr. 152). Plaintiff reported that she had not noticed significant improvement in seeing to the right with her new glasses. *Id.* Dr. Streff found plaintiff had 20/20 vision in each eye with glasses, and that plaintiff's right field of vision also had expanded 5 degrees with her glasses. (Tr. 152). Dr. Dean Streff ordered plaintiff to continue with her present prescription, gave her exercises to do at home to expand her right field of vision, and told her to follow-up in two to four months. (Tr. 152).

The ALJ's decision does not reference the findings from Streff Optometry Center and there is no indication from the ALJ's decision that such evidence was considered in formulating his opinion. In support of the ALJ's findings, the Commissioner argues only that the findings of Dr. John Streff and Dr. Dean Streff, obtained after the expiration of plaintiff's insured status, while not probative to the ALJ's disability determination, did not establish that plaintiff suffered

work-related limitations from her visual impairments. The Commissioner does not address the ALJ's failure to mention this evidence.

The findings and opinions of treating physicians are entitled to substantial weight if they are supported by objective medical evidence and uncontradicted. *Walters*, 127 F.3d at 530-31; *Harris,* 756 F.2d at 435. If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Blakely*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544.

Here, the findings from Streff Optometry are supported by objective findings and are consistent with the evidence of record. (Tr. 140). Although plaintiff saw Dr. Streff after the expiration of her insured status, his diagnosis of bilateral hemianopsia is consistent with the medical evidence of record which identifies the occurrence of right homonymous hemianopsia after the surgery to drain her brain abscess in 1976 (Tr. 127), as well as Dr. Zadikoff's finding in March 2003 that plaintiff "has her usual right hemianopia." The evidence from Streff Optometry Center therefore relates plaintiff's condition back to the relevant period and should have been considered by the ALJ. *See Johnson,* 679 F.2d at 605. Although the treatment notes from Streff Optometry Center do not explicitly state any work related limitations associated with plaintiff's visual impairments, the findings do shed light on plaintiff's visual impairment during the insured period and should have been considered by the ALJ. *Id.* As detailed above, the vocational expert testified that the lack of peripheral vision may preclude plaintiff from performing the cleaner jobs identified in response to the ALJ's hypothetical question. (Tr. 274).

21

Moreover, the ALJ's failure to adequately explain the reasons for the weight given a treating physician's opinion "*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record." *Blakely*, 581 F.3d at 407 (emphasis in the original and quoting *Rogers v. Commissioner*, 486 F.3d 234, 243 (6th Cir. 2007)).  Where the ALJ has failed to weigh a treating physician's opinion in accordance with the Social Security Administration's procedural regulations, the Court cannot excuse the failure even though there may be sufficient evidence in the record supporting the ALJ's decision:

> A court cannot excuse the denial of a mandatory procedural requirement protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely.  '[A] procedural error is not made harmless simply because the [aggrieved party] appears to have had little chance of success on the merits anyway.'  To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2), would afford the Commissioner the ability to violate the regulation with impunity and render the protections promised therein illusory.  The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action . . . found to be . . . without observance of procedure required by law.'

*Wilson*, 378 F.3d at 546 (internal citations omitted).

Here, the ALJ's failure to mention the evidence from Streff Optometry Center and/or give any indication that he considered such evidence, to evaluate those opinions by applying the relevant factors to be used in weighing a medical opinion, and to give any specific, legitimate reason for rejecting those findings was contrary to the requirements of the governing regulations. *See* 20 C.F.R. §§ 404.1527(d) and 416.927(d).[4]  Although the ALJ was not bound by the opinions

---

[4] Additionally, although not raised by the Commissioner, assuming that Dr. John Streff and Dr. Dean Streff were not determined to be treating sources, Social Security Regulations still require the ALJ to consider their opinions and provide specific, legitimate reasons for adopting or rejecting those findings. *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003) (citing § 416.927(d) and SSR 96-5p)

22

of plaintiff's treating optometrists, the ALJ was obligated to articulate "good reasons" based on the evidence of record for not giving weight to the treating physicians' opinions. *Wilson*, 378 F.3d at 544. The ALJ's failure to mention this evidence entirely precludes the Court from conducting any meaningful review of the decision. *Id.*

Plaintiff further asserts that the ALJ should have re-contacted Dr. John Streff and/or Dr. Dean Streff to obtain additional information and verification of the effects of plaintiff's visual impairment. *See* 20 C.F.R. § 404.1512(e) (setting forth how the Agency proceeds with re-contacting a claimant's treating physician when the evidence is inadequate for the Agency to determine whether the claimant is disabled.). As noted by the Commissioner this duty to "re-contact" occurs only when the ALJ does not have sufficient information to determine if a claimant is disabled. *See Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 156 n.3 (6th Cir. 2009). *See also Littlepage v. Chater*, 134 F.3d 371, 1998 WL 24999, at *1 (6th Cir. Jan. 14, 1998) (the ALJ's duty to re-contact a treating source was not triggered when all of the treatment notes and information upon which the doctor based his opinion were in the record). Here, the treatment notes from Streff Optometry Center are part of the record, and plaintiff does not assert that such records are incomplete. As noted above, the ALJ failed to wholly consider the evidence from Streff Optometry Center. On remand the ALJ must properly consider these records; however, he is not required to re-contact plaintiff's treating optometrists.

---

(Even though the one-time examining doctor "was not a treating physician, the ALJ was still required to consider his opinion, . . . and to provide specific, legitimate reasons for rejecting it."). *See also* 20 C.F.R. §§ 404.1527(d) and 416.927(d) ("Regardless of its source, we will evaluate every medical opinion we receive.").

B. *Mr. William Cody*

On May 21, 2007, William Cody, a Diplomat with the American Board of Vocational Experts, provided a vocational assessment at the request of plaintiff's attorney. Based upon his review of the medical evidence, Mr. Cody believed plaintiff was "permanently and totally occupationally disabled" because of her cognitive limitations. (Tr. 212). Mr. Cody found that Dr. Tureen's psychological evaluation and Dr. Bouman's neuropsychological evaluation supported his opinion. (Tr. 212). The ALJ's decision does not mention Mr. Cody's report and there is no indication that the ALJ considered the findings from Mr. Cody. Plaintiff asserts the ALJ erred in this regard.

The Commissioner contends that Mr. Cody is not a physician or a "medical source," but rather an "other source" as defined in the Agency's regulations. *See* 20 C.F.R. §404.1513(d). Therefore, the ALJ was not required to discuss the weight given to Mr. Cody's opinion. *See* SSR 06-3p ("Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to the opinions from these 'other sources'. . . when such opinions may have an effect on the outcome of the case."). The Commissioner asserts that Mr. Cody's opinion, rendered two years after the expiration of plaintiff's insured status and based largely on plaintiff's subjective complaints, would not have had "an effect on the outcome of the case" and the ALJ was not required to discuss the weight given to his opinion.

The undersigned agrees that the ALJ was not required to reference the report from Mr. Cody. *Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661, 665 (6th Cir. 2004) (the Sixth Circuit does not require that the ALJ's final decision cite and discuss every opinion given in the record).

Notably, Mr. Cody is a vocational expert, and not a medical doctor, who reviewed the evidence of record and determined plaintiff was unable to work. However, because this matter should be remanded for further proceedings in light of the ALJ's failure to properly consider the evidence of record, on remand the ALJ should be instructed to properly consider the entire record, including the report from Mr. Cody in making his disability determination.

### III.    The ALJ erred in assessing plaintiff's credibility

Plaintiff's final  assignment of error asserts that the ALJ erred in evaluating plaintiff's pain and credibility with respect to her visual impairments in accordance with Social Security Ruling 96-7p. SSR 96-7p provides in part:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p.

The ALJ's credibility decision must also include consideration of the following factors:  1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her

back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c) and 416.929(c); SSR 96-7p.

Here, plaintiff testified that the surgery related to her brain abscess paralyzed her right side, causing her to have no peripheral vision in the right side of both of her eyes. (Tr. 246-47). She further testified that while in college she received financial assistance and special services from the Bureau for Services of the Visually Impaired. (Tr. 231).

The ALJ recited the requisite factors in SSR 96-7p and found plaintiff to be "partially but not fully credible." (Tr. 20-21, 24). The ALJ found that plaintiff's "testimony of having very severe cognitive and physical residual from her brain deficit is very inconsistent with the [IQ] testing" done by Dr. Tureen. (Tr. 24). The ALJ further noted that plaintiff's sister corroborated "some of plaintiff's allegations but her sister is not an independent neutral source, and her testimony was also inconsistent with the objective evidence." *Id.*

The ALJ's credibility finding is without substantial support in the record. As detailed above, substantial evidence exists in the record that plaintiff suffers from bilateral hemianopia which results in diminished peripheral vision. In 2000, Dr. Zadikoff treated plaintiff for vertigo and noted "blindness" in June 2000. (Tr. 134). In March 2003, Dr. Zadikoff opined that plaintiff "has a right hemianopia" which resulted from her brain abscess in 1976. (Tr. 140). After examining plaintiff, Dr. Zadikoff found that plaintiff "has her usual right hemianopia." Additionally, in November 2004, Dr. Streff, an optometrist, examined plaintiff and diagnosed her with bilateral hemianopsia (the loss of half of the field of view on the same side in both eyes),

26

secondary to plaintiff's past brain abscess, and myopia. (Tr. 156). Additionally, plaintiff testified

that she has no peripheral vision on the right side on both eyes. (Tr. 247).

The ALJ's credibility determination is not supported by substantial evidence because he

failed to properly consider the objective medical evidence in support of plaintiff's testimony

relating to her visual impairment in accordance with SSR 96-7p. Although the ALJ was not

bound to accept plaintiff's statements about her visual impairments, he was obligated to follow

the Social Security Rules and Regulations and the law of this Circuit in assessing plaintiff's

credibility. He failed to do so in this case. Plaintiff's fourth assignment of error should be

sustained.

### IV. This matter should be remanded for further proceedings

A sentence four remand provides the required relief in cases where there is insufficient

evidence in the record to support the Commissioner's conclusions and where further fact-finding

is necessary. *See Faucher v. Secretary of Health and Human Servs.,* 17 F.3d 171, 174 (6th Cir.

1994) (citations omitted). In a sentence four remand, the Court makes a final judgment on the

Commissioner's decision and "may order the Secretary to consider evidence on remand to remedy

a defect in the original proceedings, a defect which caused the Secretary's misapplication of the

regulations in the first place." *Faucher,* 17 F.3d at 175.

In determining whether this matter should be reversed outright for an award of benefits or

remanded for further proceedings, the Court notes that all essential factual issues have not been

resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to

benefits as of her alleged onset date. *Faucher,* 17 F.3d at 176. This matter should be remanded

for further proceedings. On remand, the ALJ should properly evaluate plaintiff's visual

impairment in light the evidence of record, properly determine the weight to be accorded to the opinions of plaintiff's treating physicians, including Dr. John and Dr. Dean Streff, and clearly articulate the rationale in support thereof; reconsider plaintiff's RFC and credibility assessment; and accurately portray plaintiff's impairments when questioning the vocational expert.

Additionally, on remand, the ALJ should be mindful of the Sixth Circuit's recent decision in *Ealy v. Commissioner of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010), wherein the Court held that a hypothetical question limiting the claimant to simple, unskilled, routine jobs did not sufficiently account for moderate deficiencies in concentration, persistence, and pace. Here, the ALJ adopted the finding of Dr. Tureen that plaintiff had moderate difficulty maintaining concentration, persistence or pace in light of her lowered stress threshold and her significantly impaired memory. (Tr. 22). However, the ALJ's hypothetical question to the vocational expert does not clearly identify an individual with such moderate limitations. (Tr. 263-75).

## IT IS THEREFORE RECOMMENDED THAT:

This case be REVERSED and REMANDED for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: 6/20/2011

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ELLEN GOBER,                           Case No. 1:10-cv-532
      Plaintiff                    Spiegel, J.
                                      Litkovitz, M.J.

  vs

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).